**In re GRAND JURY SUBPOENA DATED NOVEMBER 8, 1979.**

**No. 80–5079.**

United States Court of Appeals,
Sixth Circuit.

Argued March 11, 1980.
Decided June 6, 1980.

Vincent J. Fuller, William E. McDaniels, Gregory B. Craig, Barry S. Simon, Williams & Connolly, Washington, D. C., Nathan B. Goodnow, Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., for appellant.

James K. Robinson, U. S. Atty., Detroit, Mich., John J. Powers, III, Bruce E. Fein, Dept. of Justice, Washington, D. C., for appellee.

Before BROWN, MARTIN and JONES, Circuit Judges.

PER CURIAM.

The United States has moved to compel Francis X. Grossi, Esquire, to answer ques-

tions before the grand jury concerning his representation while an associate at Williams & Connolly (then Williams, Califano & Connolly) of Velsicol Chemical Corporation (then Michigan Chemical Corporation) during an investigation and hearings conducted by the Food and Drug Administration. Velsicol and Williams & Connolly intervened to contest the subpoena served on Grossi and the motion to compel his testimony. The district court granted the motion to compel on all but one question.[1] By a previous order we reversed the district court and held that the work product privi-

1. The questions asked by the grand jury were:

I. How many drafts were there of the documents submitted to FDA on March 17, and April 18, 1975, in connection with the 305 hearings:
A. To whom were each of the drafts circulated?
1. Lawyers at Williams & Connolly?
2. Lawyers outside Williams & Connolly?
3. Employees or officers of Michigan Chemical Company?
4. Any else?
B. Did any persons suggest changes, additions, deletions? Who?
C. Were the drafts kept in the case file maintained at Williams & Connolly?
D. Who provided the factual basis for the submissions?

II. In connection with representation of Michigan Chemical Company concerning the PBB contamination incident, were there any meetings in Washington between lawyers from Williams & Connolly and officers or employees of Michigan Chemical Company?
A. Were memoranda made of any of the meetings?
B. To whom were each of the memoranda circulated?
C. Were such memoranda kept in the case file maintained at Williams & Connolly? Where else were they filed?
D. Who had access to each of the memoranda?

III. In connection with representation of Michigan Chemical Company concerning the PBB contamination incident, were there any meetings in Chicago between lawyers from Williams & Connolly and officers or employees of Michigan Chemical Company?
A. Were memoranda made of any of the meetings?
B. To whom were each of the memoranda circulated?
C. Were such memoranda kept in case file maintained at Williams & Connolly? Where else?
D. Who had access to each of the memoranda?

IV. In connection with representation of Michigan Chemical Company concerning the PBB contamination incident did you and/or other Williams & Connolly representatives go to Michigan Chemical Corporation's St. Louis plant?
A. Did you or any other Williams & Connolly representative tour the facilities?
B. Were photographs taken?
1. Where were such photographs kept?
2. To whom were such photographs circulated?
3. Who had access to the photographs?
C. Were any memoranda, tape recordings, stenographic recordings, or notes made?
1. What format was used?
2. Where were they filed?
3. To whom were they distributed?
4. Who had access to each?
With respect to each:
1. When did each interview or meeting take place?
2. Where did each interview or meeting take place?
3. Who else was present at each meeting or interview?
4. Were memoranda made of any of the meetings or interviews? .
a. Where were such memoranda filed?
b. To whom were they distributed?
c. Who had access to such memoranda?

V. Did you or other Williams & Connolly representatives interview or meet with any of the following Michigan Chemical Company employees:
1.–17. [names deleted]
18. any others.

VI. In connection with representation of Michigan Chemical Company concerning the PBB contamination incident, did you or other Williams & Connolly representatives interview or meet with any persons other than Michigan Chemical Corporation employees? With respect to each:
1. When did each interview or meeting take place?
2. Where did each interview or meeting take place?
3. Who else was present at each meeting or interview?
4. Were memoranda made of any of the meetings or interviews?
a. Where were such memoranda filed?
b. To whom were they distributed?
c. Who had access to such memoranda?

The district court did not order Grossi to answer question I. B.

lege protected Grossi from answering any of the questions at issue.[2] This opinion explains our reasoning.

## I.

The Food and Drug Administration began an investigation of Velsicol in 1974, alleging that Velsicol had mislabeled an animal feed additive and had contaminated the animal feed with the fire retardant chemical polybrominated biphenyl (PBB). Velsicol retained Williams & Connolly to represent it during the FDA investigation and at the hearing held on March 17, 1975. Grossi, as an associate at Williams & Connolly, participated extensively in the investigation of the alleged violations and the preparation of the defense. On May 19, 1978, Velsicol entered a plea of *nolo contendere* to misdemeanor violations of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.*

In late 1978, a grand jury in the Eastern District of Michigan launched an investigation to determine whether Velsicol, any of its present or former employees, or any attorney had made false, fictitious or fraudulent statements to the FDA during its prior investigation. On April 26, 1979, the grand jury indicted Velsicol and two corporate officers for violations of 18 U.S.C. § 1001. While continuing its investigation against other persons, the grand jury issued a subpoena *ad testificandum* to Grossi. Grossi appeared before the grand jury on January 9, 1980 and answered all questions but those at issue. His refusal to answer certain questions was based on attorney-client privilege, work product privilege, and constitutional rights protected by the Fifth and Sixth Amendments. Because we hold that the work product privilege applies to all the questions at issue, we do not address the applicability of attorney-client privilege or the Fifth and Sixth Amendments.

## II.

■ A corporate client and a law firm may assert the work product privilege to

prevent the discovery of relevant information by a grand jury. *In re Grand Jury Proceedings (Duffy)*, 473 F.2d 840, 842 (8th Cir. 1972). The privilege extends necessarily to the work product compiled in previous, terminated litigation. *In re Grand Jury Proceedings (FMC Corp.)*, 604 F.2d 798, 803 (3d Cir. 1979); *United States v. Leggett & Platt, Inc.*, 542 F.2d 655, 660 (6th Cir. 1976), *cert. denied*, 430 U.S. 945, 97 S.Ct. 1579, 51 L.Ed.2d 792 (1977). Work product consists of the tangible and intangible material which reflects an attorney's efforts at investigating and preparing a case, including one's pattern of investigation, assembling of information, determination of the relevant facts, preparation of legal theories, planning of strategy, and recording of mental impressions. *Hickman v. Taylor*, 329 U.S. 495, 511, 67 S.Ct. 385, 393, 91 L.Ed. 451 (1947); *Besly-Welles Corp. v. Balax, Inc.*, 43 F.R.D. 368, 371 (E.D.Wis.1968). The privilege creates a zone of privacy in which an attorney can investigate, prepare, and analyze a case. *In re Grand Jury Subpoena (General Counsel, John Doe, Inc.)*, 599 F.2d 504, 511 (2d Cir. 1979).

■ Applying these principles, we conclude that the grand jury's questions viewed as a whole delved into areas protected by the work product privilege. The questions seek information on drafts of submissions to the FDA and memoranda of interviews, which the courts have uniformly classified as work product. The questions are not aimed at learning the names and locations of possible witnesses, since the questions reveal that the grand jury already has this information, or could easily obtain it from other sources. *See Matter of Grand Jury Subpoena*, 438 F.Supp. 1176, 1178 (S.D.N.Y.1977). Instead, the questions in light of the grand jury's knowledge after an extensive investigation, request information which probably "would yield substantially probative links in an existing chain of inculpatory events or transactions . . .

---

**2.** In a previous per curiam opinion, we held that this Court had jurisdiction pursuant to 28 U.S.C. § 1291 to hear this appeal.

and could drastically diminish the value of legal discussions or planning that took place previously . . . ." *In re Grand Jury Proceedings (Jones)*, 517 F.2d 666, 674 (5th Cir. 1975). In the circumstances of our case, seemingly innocuous questions, such as who was interviewed by Williams & Connolly, take on a harmful coloration. *See In re Grand Jury Subpoena (General Counsel, John Doe, Inc.), supra* (preliminary questionnaires answered by employees); *In re Terkeltoub*, 256 F.Supp. 683, 685 (S.D.N.Y. 1966) (names of interviewees). Therefore, we hold that all the questions ask for information protected by the work product privilege.

▆▆▆ The work product privilege is not absolute, *United States v. Nobles*, 422 U.S. 225, 239, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975); *United States v. Leggett & Platt, Inc.*, 542 F.2d at 660, but the United States has not demonstrated sufficient cause for overcoming the privilege. *But see Velsicol Chemical Corp. v. Parsons*, 561 F.2d 671, 676 (7th Cir. 1977); *Handguards, Inc. v. Johnson & Johnson*, 413 F.Supp. 926, 931, 933 (N.D.Cal.1976). In the present posture of the case, it appears to us that the United States has attempted to embark on a general fishing expedition into the files of Williams & Connolly mainly to satisfy itself that nothing has been overlooked. The work product privilege forbids such excursions. *United States v. Nobles*, 422 U.S. at 240, 95 S.Ct. at 2171; *Hickman v. Taylor*, 329 U.S. at 513, 67 S.Ct. at 394. The United States has not asserted that the names and addresses of potential witnesses are unknown to it or are available from other sources only with undue hardship. Nor has it alleged that these witnesses, though known, are unavailable to testify. Moreover, even if the questions were only threshold inquiries which would not reveal

the substance of communications, the questions concern drafts of submissions and memoranda which may be disclosed only in rare and extraordinary circumstances. *Hickman v. Taylor*, 329 U.S. at 512, 67 S.Ct. at 394; *In re Grand Jury Investigation (Sun Co.)*, 599 F.2d 1224 at 1230–31; *In re Murphy*, 560 F.2d 326, 336 (8th Cir. 1977). Thus, we are loath to permit even threshold questions about such information and materials in the law firm's files, unless the United States can make a preliminary showing that it probably could demonstrate sufficient cause to obtain those files.

The district court did not make any findings on good cause, because of its conclusion that the privilege did not apply to all but one of the questions. It also appears that the United States argued cause only in a cursory manner. Therefore, we do not make a final determination on whether or not good cause may exist.[3] However, the affidavits previously presented by the United States do not meet its burden of demonstrating good cause.

Accordingly, the judgment of the district court granting in part the motion to compel Grossi's testimony before the grand jury is reversed, but without prejudice to the United States to present further evidence and argument on good cause.

---

3. If a determination on good cause is necessary, the district court should consider the following factors:

    a) the nature of the information sought;
    b) the extent to which the information would reveal the attorney's mental processes;
    c) the likely reliability of the information;
    d) the degree of danger that the attorney would become a witness against the client, or

that the attorney-client relationship would be disrupted in any other way;
    e) the availability of other sources for the information; and
    f) whether the letter or spirit of the Fifth and Sixth Amendments would be infringed.
*In re Grand Jury Investigation (Sun Co.)*, 599 F.2d at 1231–32; *Matter of Rosenbaum*, 401 F.Supp. 807 (S.D.N.Y.1975).